Argued and submitted February 16, reversed and remanded in part; vacated and remanded in part; otherwise affirmed June 16, appellants' petition for reconsideration filed June 18 allowed by opinion September 15, 1999
See 162 Or App 671 (1999)

Kenneth L. EDWARDS,
Sharon A. Edwards, Robert W. West and
Gwendolyn F. West,
*Respondents,*

*v.*

Jim L. SALEEN-DEGRANGE
and Eula Saleen-Degrange,
*Appellants,*

*and*

Jimmie L. SALEEN-DEGRANGE,
*Defendant,*

*and*

Linda SALEEN-DEGRANGE,
Riter H. Dean, Lenabelle Dean and
Martha K. Storaci,
*Respondents.*

Riter H. DEAN,
Lenabelle Dean, Martha K. Storaci,
and Linda Pachal, fka Linda Saleen-Degrange,
*Plaintiffs,*

*v.*

YAMHILL COUNTY,
a political subdivision of the State of Oregon,
*Third-Party Defendant.*

Jim L. SALEEN-DEGRANGE
and Eula Saleen-Degrange,
*Plaintiffs,*

*v.*

YAMHILL COUNTY,
a political subdivision of the State of Oregon,
*Cross-Claim-Defendant.*

(CV 94-343; CA A99185)

984 P2d 854

157

Carl R. Neil argued the cause for appellants. With him on the briefs was Lindsay, Hart, Neil & Weigler LLP.

John Bridges argued the cause for respondents Kenneth L. Edwards, Sharon A. Edwards, Robert W. West and Gwendolyn F. West. With him on the brief was Brown, Tarlow, Smith & Bridges, P.C.

Jerry B. Hart argued the cause for respondent Linda Saleen-Degrange. With him on the brief was Craig Brand, Lake & Hart.

Mark C. Hoyt argued the cause and filed the brief for respondents Riter H. Dean, Lenabelle Dean and Martha K. Storaci.

Before Landau, Presiding Judge, and Wollheim and Brewer, Judges.

BREWER, J.

**BREWER, J.**

This multi-party dispute concerns two boundary locations and access to adjoining properties on the outskirts of Dayton, in Yamhill County. Kenneth and Sharon Edwards and Robert and Gwendolyn West (plaintiffs) brought this action against defendants Jim and Eula Saleen-Degrange (Jim and Eula), Jimmie Saleen-Degrange (Jimmie) and Linda Pachel (Linda)[1]—the owners of the northerly adjoining properties—and defendants Lenabelle and Riter Dean (the Deans) and Martha Storaci (Storaci)—sellers of all the properties at issue. Plaintiffs sought to relocate the common boundary between their property and the northern properties. The Deans and Storaci filed a third-party claim against Yamhill County to establish the nonexistence of a public road along the common boundary and sought to reform the boundary descriptions in the sale instruments. They also filed a cross-claim against Jim and Eula seeking to relocate another boundary and to reform the instruments involved in that sale. Jim and Eula opposed relocating either boundary but alternatively argued that implied easements across the disputed parcel provided access to their property from a nearby public road. On summary judgment, the trial court declared that the public road did not exist, and, after a bench trial on the remaining claims, relocated both boundaries, reformed the sale instruments, and limited the extent of Jim and Eula's implied easements. We reverse the summary judgment determining as a matter of law that the street does not exist, as well as portions of the final judgment after trial pertaining to the boundary locations and the implied easement determination, and otherwise affirm.

Before 1986, Lenabelle Dean and Storaci, who are sisters, jointly owned several parcels of property on the outskirts of Dayton, including the southwest corner of Lot 5 and Lots 6, 7, 8, Lippencott's Second Addition.[2] The Deans owned

---

[1] Jim and Eula are Jimmie's parents. Jimmie and Linda were married when they jointly purchased some of the property involved in this litigation. They were later divorced.

[2] In 1889, B.E. and Frank Lippencott sold approximately 225 acres to B.P. Cardwell. In 1890, Cardwell divided roughly 170 acres of that property into six

Lot 11, Fletcher's Addition.[3] Lots 5, 6, 7, 8 are located adjacent to each other from east to west, while Lot 11 borders Lots 6, 7, and 8 to the south. A map of the lands involved in the dispute is set out below.

MAP IS AN APPROXIMATION
AND NOT DRAWN TO SCALE

blocks and subdivided the blocks into 66 lots. He then dedicated those 170 acres to the city of Dayton. That dedication is known as Lippencott's Second Addition.

[3] Fletcher's Addition is an 1892 land dedication to the city of Dayton that borders Lippencott's Second Addition to the south.

In 1986, Storaci sold her interest in Lot 5 to the Deans. At that time, only Lot 6 and Lot 11 contained buildings. Lot 6 had a house located near its southern boundary and a garage located near its eastern boundary. Lot 11 contained two mobile homes. One mobile home was located on the northern part of the property, while the other was situated at the southwest corner. A garage and outbuildings were associated with the northern mobile home. A gravel driveway provided access to the house on Lot 6 and to the northern mobile home on Lot 11. The driveway connected to a public road near the southeast corner of Lot 6 and the northeast corner of Lot 11. The driveway forked, with the right fork leading to the garage on Lot 6 and the left fork running parallel to the southern boundary of Lots 6 and 7 and ending at the garage on Lot 11. For many years, a rose bush and a line of fir trees bordered the northern edge of the driveway's left fork.

In 1987, Jim, Eula, Jimmie and Linda approached the Deans and Storaci about purchasing Lots 5, 6, 7 and 8. Jim and Eula eventually purchased Lots 5, 7 and 8, and Jimmie and Linda purchased Lot 6. At that time, Jim, Eula, Jimmie and Linda each understood that the house and garage belonged to and would be sold with Lot 6.

In 1991, plaintiffs purchased Lot 11 from the Deans. From 1991 to 1994, plaintiffs used the left fork of the driveway for access to their home and garage. In 1994, they began to complain about heavy equipment that Jimmie and Linda parked in the driveway. About that time, Jim wrote a letter to plaintiffs stating that he believed that the northern buildings on Lot 11 encroached over the boundary line and onto Lot 7. Plaintiffs responded by filing this lawsuit against Jim and Eula, Jimmie and Linda, the Deans, and Storaci.

Plaintiffs alleged that the boundary line separating Lot 11 to the south and Lots 6, 7, and 8 to the north had for many years been established by the rose bush and tree line (hereinafter north line) located north of their buildings and north of the left fork of the driveway and was located approximately 21 feet north of the record line. They asserted title to the north line based on theories of boundary by agreement and boundary by practical location and asked the trial court to declare the north line to be the true boundary and to quiet

title to the property south of that line in favor of plaintiffs.[4] The various defendants responded with numerous counter-claims, cross-claims, and third-party claims.[5]

The Deans and Storaci, as sellers of all the property at issue, generally agreed with plaintiffs and asserted several cross-claims against Jim and Eula. They alleged alternative theories of boundary by agreement, adverse possession and estoppel to support relocation of the boundary to the north line. They also alleged that the instruments conveying Lots 6, 7, and 8 should be reformed to describe the north line as the boundary.

Jim and Eula filed answers asserting that the disputed area between the north line and the record line was a dedicated public road known as Oak Street. The Deans and Storaci then asserted third-party claims against Yamhill County, seeking a declaration that Oak Street did not exist as a public road because the person who attempted to dedicate Oak Street in 1892 did not own the land on which the road was located. The Deans and Storaci moved for summary judgment on those claims, contending that the dedication failed as a matter of law. Yamhill County did not contest the summary judgment.[6] However, Jim and Eula cross-claimed against Yamhill County seeking a declaratory judgment that Oak Street did exist as a public road. They also opposed summary judgment. The trial court determined that the attempted dedication of Oak Street failed as a matter of law, granted summary judgment in favor of the Deans and Storaci and dismissed Jim and Eula's cross-claim against Yamhill County. At trial, Jim and Eula contended that the south line was the true boundary; alternatively they asked the trial court to declare that Lot 7 was entitled to an easement

[4] The litigation initially involved multiple legal and equitable claims. This appeal involves only the equitable claims. Therefore, we do not address the legal claims.

[5] We discuss only those claims necessary to resolve the issues on appeal.

[6] Yamhill County did not contest either the third-party claim filed by the Deans and Storaci or the separate cross-claim filed by Jim and Eula seeking a declaratory judgment that the public road does exist. The trial court's final judgment favored the Deans and Storaci on their third-party claim and Yamhill County on Jim and Eula's cross-claim. Yamhill County did not appeal from the judgment on the third-party claim and did not participate on appeal in defense of the judgment on Jim and Eula's cross-claim.

implied by necessity or prior use over Lot 11 to the nearest public road.

During the litigation, a dispute also developed concerning the boundary location between Lot 6 to the west and Lot 5 to the east. Linda,[7] the Deans and Storaci asserted cross-claims against Jim and Eula, alleging that the boundary between Lots 5 and 6 should be relocated along a line five feet east of the garage on Lot 6 (hereinafter east line). They acknowledged that the instruments that conveyed Lots 5 and 6 fixed the boundary west of the east line and, if the instruments controlled, then the garage on Lot 6 encroached on Lot 5. However, they alleged that the doctrines of boundary by agreement, adverse possession, and estoppel each required relocation of the boundary to the east line and sought a declaratory judgment to that effect. Alternatively, they sought reformation of the instruments that conveyed Lots 5 and 6.

After a bench trial, the court entered a judgment establishing the north line as the true boundary between Lot 11 and Lots 6, 7, and 8, and establishing the east line as the true boundary between Lots 5 and 6. The court also reformed the relevant land sale contracts and deeds to position their boundary descriptions at the north line and the east line and declared an easement in favor of Lots 6, 7 and 8 over the northeast corner of Lot 11, which did not include the left fork of the driveway. This appeal by Jim and Eula followed.

On appeal, Jim and Eula first argue that the trial court erred in dismissing their cross-claim against Yamhill County following summary judgment. Jim and Eula argue that several genuine issues of material fact precluded that decision.[8] When reviewing a grant of summary judgment, we must determine whether there was a genuine issue as to any material fact and whether the moving party was entitled to

---

[7] After he and Linda divorced, Jimmie attempted to transfer his interest in Lot 6 to his parents and no longer claims an interest in the property.

[8] Plaintiffs argue that because Jim and Eula did not file a motion to intervene, pursuant to ORCP 33 D, they lacked standing to contest the motion for summary judgment filed by the Deans and Storaci. The trial court permitted Jim and Eula to contest that motion. The Deans and Storaci did not cross-assign error to that ruling. ORAP 5.57. Therefore, we will not discuss it further.

judgment as a matter of law. ORCP 47 C; *Hampton Tree Farms, Inc. v. Jewett,* 320 Or 599, 613, 892 P2d 683 (1995). We view the evidence and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Jones v. General Motors Corp.,* 325 Or 404, 413, 939 P2d 608 (1997). The summary judgment record includes affidavits and other evidence in support of, and in opposition to, that motion. *Id.* at 412.

In moving for summary judgment, the Deans and Storaci conceded that there was an attempted dedication of Oak Street, as shown in the recorded plat of Lippencott's Second Addition. However, they contended that the dedication was entirely consumed by lots contained in the plat. They also argued that Oak Street's location on the plat map was approximately 50 feet south of any property owned by the dedicator. To support those contentions, they submitted a copy of the deed that conveyed the land to the dedicator, a copy of the instrument dedicating Lippencott's Second Addition, copies of the plat maps, and a computer analysis that plotted the lots and compared the location of the property contained in the deed with the location of the road. They also submitted an affidavit from their attorney stating that he reviewed the analysis with Dan Linscheid, the Yamhill County surveyor, and that Linscheid agreed that Oak Street was located south of the property owned by the dedicator.

In their response to the motion for summary judgment, Jim and Eula challenged the assertion that Linscheid agreed that Oak Street was located outside of the property owned by the dedicator and disputed the competency of the computer analysis. In support of their position, Jim and Eula submitted an affidavit subscribed and sworn to by Linscheid in another lawsuit, in which Linscheid stated that the southern boundary of Oak Street ran along the southern boundary of Lippencott's Second Addition and, therefore, was within the property owned by the dedicator. The Deans and Storaci responded to that submission by tendering a second affidavit from Linscheid stating that he reviewed their analysis and agreed that all of Lippencott's Second Addition was allocated to lots, leaving no room to dedicate Oak Street. Linscheid also explained that an improper assumption in his analysis led to a contrary and mistaken conclusion in his earlier affidavit.

Based on that evidence, the trial court granted summary judgment and held that the attempted dedication of Oak Street failed as a matter of law.

■ On appeal, Jim and Eula argue that Linscheid's contradicting affidavits created an issue of fact.[9] The Deans and Storaci respond that the contradiction did not create a question of fact because Linscheid explained why his conclusion in the first affidavit was incorrect. In other words, according to the Deans and Storaci, the trial court could evaluate the credibility of Linscheid's explanation and conclude that it eliminated any question of fact created by the earlier affidavit. We disagree.

■ In deciding a motion for summary judgment, a trial court may not determine issues of fact; instead, the court must ascertain if a genuine issue of material fact exists. *Stevens v. Bispham,* 316 Or 221, 243, 851 P2d 556 (1993); *Forest Grove Brick v. Strickland,* 277 Or 81, 87, 559 P2d 502 (1977). Consistent with that role, we have held that when a trial court is confronted with a nonmoving party's inconsistent statements, it may not evaluate the credibility of an explanation in the later of the statements to resolve the factual conflict. *Taal v. Union Pacific Railroad Co.,* 106 Or App 488, 494, 809 P2d 104 (1991).

In *Taal,* the defendant, the moving party, submitted a statement from the plaintiff that absolved the defendant of liability. *Id.* at 490. In response, the plaintiff submitted another statement that contradicted the plaintiff's earlier statement and explained why the earlier statement was incorrect. *Id.* at 490-92. The defendant argued that the second statement could not create a factual question because the explanation was unbelievable and a sham. *Id.* at 493. We held that it was not within the province of the trial court to disbelieve the explanation for purposes of summary judgment because it is the factfinder's role, at trial, to decide which is true. *Id.* at 494.

---

[9] They also generally argue that defendants Dean's and Storaci's own evidence contained factual issues that precluded granting summary judgment. Because we hold that the conflicting affidavits create an issue of fact, we do not address the remaining arguments.

Here, unlike *Taal*, Jim and Eula, the nonmoving parties, submitted an affidavit from the Deans' and Storaci's witness to create a fact question by contradicting the Deans' and Storaci's assertion that the witness agreed with their conclusion. Standing alone, that affidavit created a genuine issue of material fact as to whether the dedication of Oak Street failed as a matter of law. In an attempt to eliminate the factual issue, the Deans and Storaci tendered a second statement from the witness that contradicted his first statement but explained why the two conclusions differed.

Notwithstanding procedural distinctions, both situations require the trial court to evaluate the credibility of the explanation in order to grant summary judgment. In *Taal*, the court had to disbelieve the explanation in order to conclude that the second statement did not create a question of fact. Here, the trial court had to believe the explanation to conclude that the second statement superseded the first statement and eliminated that genuine issue of fact. A court cannot make either determination on summary judgment because each is an evaluation of credibility. *See also Stoeger v. Burlington Northern Railroad Co.*, 323 Or 569, 576, 919 P2d 39 (1996). Therefore, we hold that the trial court erred in granting summary judgment.

Jim and Eula's second, third and fifth assignments of error relate to the boundary between Lots 6, 7, and 8 and Lot 11 and the use of the left fork of the driveway to provide access for Lots 7 and 8. They contend that the court erred in concluding that the north line was the true boundary between Lots 6, 7, and 8 and Lot 11, that the Deans and Storaci were entitled to reform the sale contracts and deeds for those properties, and that Lots 7 and 8 were not entitled to implied easements over the left fork of the driveway. Jim and Eula's fourth assignment of error involves the boundary between Lots 5 and 6; they assert that the trial court erred in concluding that Linda was entitled to reformation in order to establish the east line as the boundary between Lots 5 and 6. However, Jim and Eula also argue that we should vacate the entire final judgment in the event we reverse the trial court's

summary judgment and remand for a determination whether Oak Street was validly dedicated.[10]

Jim and Eula reason that, if the trial court concludes on remand that Oak Street exists, the property boundaries cannot be relocated because the equitable theories on which the court relied do not authorize acquisition of title to public land. Their argument assumes that, if Oak Street exists, its southern boundary is located along the record boundary line rather than the north line. Plaintiffs and the Deans and Storaci dispute that assumption; they contend that if the court finds that Oak Street exists, it must place the street along the north line because the court has already found that the parties by their actions have relocated the boundary.

Plaintiffs' and the Deans' and Storaci's argument is incorrect because it reverses the order of inquiry. The court must first determine the existence and location of Oak Street and thus ascertain whether the disputed property constitutes public land. Oak Street, if it exists at all, must be contiguous to the record boundary line on its north side because it is undisputed that the dedicator intended the street to border the southern boundary of the dedicated property. At the time of the dedication that boundary was the record line. Therefore, if Oak Street exists, Jim and Eula are correct that the property boundary cannot be relocated to the north line because no current or previous owner of Lot 11 could adversely acquire title to public land. *See Coos County v. State of Oregon,* 303 Or 173, 192, 734 P2d 1348 (1987) (ORS 275.027 bars adverse possession against county owned land); *see also Corvallis Sand and Gravel v. Land Board,* 250 Or 319, 332, 439 P2d 575 (1968) (government cannot lose property rights through acquiescence). Also, if Oak Street exists, the trial court's conclusion that Jim and Eula cannot use the

---

[10] The Deans and Storaci contend that we should not review the second, third and fourth assignments of error because an independent basis for entry of the judgment exists and is not challenged by Jim and Eula. Specifically, they argue that, because the Deans sought a declaratory judgment against Jim and Eula to establish the boundary lines, and because Jim and Eula did not assign the grant of declaratory judgment as error, we should not consider the remaining assignments of error. We disagree. Jim and Eula assigned error to all of the relevant portions of the trial court's judgment. *See generally* ORAP 5.45(2).

left fork of the driveway for access to their property is incorrect.

Having so concluded, we vacate those portions of the judgment relocating the property boundary between Lots 6, 7, and 8 and Lot 11, reforming the sale contracts and deeds to reflect the relocated boundary, and determining that there is no implied easement in favor of Lot 6, 7 and 8 over the left fork of the driveway.[11] However, because the possible existence of Oak Street could affect only the boundary between Lot 11 and Lots 6, 7, and 8, we may not, at least for that reason, disturb the portion of the judgment relocating the property boundary between Lot 5 and Lot 6 along the east line and reforming the sale contract to conform to that location.

■    Therefore, we next turn to Jim and Eula's fourth assignment of error; they argue that the court erred in relocating the boundary between Lots 5 and 6 along the east line based on mutual mistake or, alternatively, boundary by agreement.[12] Linda, the Deans and Storaci counter that either theory authorized the court to relocate the boundary, and Linda contends that reformation was the more appropriate. She argues that reformation was justified because, at the time Lots 5 and 6 were purchased, all parties to the transactions mistakenly believed that the garage was located entirely within Lot 6 and assumed that the sale contracts contained property descriptions consistent with that belief.

■■    On appeal, we review the trial court's factual determinations *de novo* to determine if there was clear and convincing evidence of a mutual mistake justifying reformation of the relevant contracts. *Ellison v. Watson*, 53 Or App 923, 633 P2d 840, *rev den* 292 Or 109 (1981). The purpose of reformation based on mutual mistake is to make an erroneous

---

[11] We vacate those portions of the judgment that reflect the trial court's decision in favor of plaintiffs on their first and second claims for relief contained in their amended suit to quiet title. We also vacate those portions of the judgment in favor of the Deans and Storaci on their first, second and third cross-claims against Jim and Eula contained in the answer and affirmative defenses to plaintiff's first amended complaint.

[12] In its judgment, the court also reformed Jim and Eula's Lot 5 sale contract and deed boundary description along the east line. Jim and Eula do not assign error to that part of the judgment.

instrument, or instruments, correctly express the real agreement between the parties. *Manning Lumber Co. v. Voget*, 188 Or 486, 500, 216 P2d 674 (1950).

> "Where [the] written instrument is merely intended to record a prior, definite, and specific oral understanding of the parties, but, because of a mutual mistake, that instrument fails to set out the prior agreement correctly in some material respect, a court of equity will ordinarily reform it." *Id.*

The trial court found that the parties intended the garage be conveyed with Lot 6—instead of Lot 5—and that the boundary description contained in the sale contract was not consistent with that intention. That finding, if upheld, would justify reformation of the contracts to include the disputed land. *See Linenberger et ux. v. Schick*, 193 Or 14, 16, 236 P2d 925 (1951) (mutual mistake concerning location of garage justified reformation to eliminate encroachment); *see also Zink et ux v. Davis et ux*, 203 Or 49, 277 P2d 1007 (1954).[13]

We agree with the trial court that all parties to the transactions understood that the garage was located on Lot 6 and intended it to be sold with Lot 6. The Deans and Storaci (sellers of both parcels) testified that their intention at the time of the virtually contemporaneous sales of the lots in 1987 was that the garage belonged to and would be sold with Lot 6, rather than Lot 5. Jimmie and Linda each testified to the same effect. Moreover, although Jim did not testify at trial, in his brief on appeal he concedes that he believed that the garage was located on Lot 6. Eula testified that when she and Jim purchased Lot 5 she knew that it did not include any buildings and that she thought the garage was located on Lot 6. Based on a complete review of the record, we conclude that the trial court properly reformed the written instruments covering Lots 5 and 6 in order to correct the parties' mutual mistake.

Summary judgment on existence of road reversed and remanded; those portions of paragraphs 2, 4, and 5 of the trial court's final judgment dated October 3, 1997, relating to

---

[13] We reject Jim and Eula's contention that reformation based upon mutual mistake in boundary disputes invariably requires an antecedent agreement as to a specific and definite boundary line. That principle is inapplicable to reformation cases involving structural encroachments. *Compare Ellison* with *Linenberger*.

the boundary between Lots 6, 7, and 8 and Lot 11 and implied easements in favor of Lots 6, 7, and 8 vacated and remanded; otherwise affirmed.